# Jones v. Commonwealth.

(Decided June 18, 1937.)

PERRY B. MILLER, N. R. PATTERSON and ARTHUR RHORER for appellant.

HUBERT MEREDITH, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, Tom Jones, was convicted in the Bell circuit court of murdering his wife, Flossie Jones, the homicide being committed in Middlesboro, Ky., on October 30, 1935. He was given the death penalty, and the trial court overruled his motion for a new trial. On appeal therefrom to this court the judgment was affirmed in the case of Jones v. Commonwealth, 267 Ky. 465, 102 S. W. (2d) 345. On the day the sentence was to be carried out by the warden of the Eddyville peni-

tentiary appellant filed his petition in the United States District Court for the Western District of Kentucky for a writ of habeas corpus, upon the ground of newly discovered evidence since the affirmance of the judgment, which ordinary diligence on the part of appellant and his counsel could not have discovered. The presiding judge of that court, Hon. Elwood Hamilton, heard the testimony of some or all of the alleged newly discovered witnesses. It was taken down and transcribed and has been made a part of this record. The court declined to render a final opinion in the cause, but continued in force a temporary order restraining the warden from executing the judgment, and which the court had issued ex parte upon the filing of the petition therein. The continuance of that order was for the purpose, as stated by the court, of enabling appellant to exhaust any remedies he might have in the state courts. Following that, and on May 4, 1937, application was made to the Bell circuit court, presided over by Hon. James M. Gilbert, for a writ of coram nobis, and which was based upon the same grounds urged before Judge Hamilton for a writ of habeas corpus, Judge Gilbert denied the motion and dismissed the petition.

Before appealing from that judgment, and on May 21, 1937, appellant filed an original petition in this court setting up the same facts relied on in the two applications referred to and in which he prayed for the issuing of a writ of habeas corpus by this court "and that he be discharged from such unlawful restraint and imprisonment and for all other proper, just and equitable relief." On June 11, 1937, we disposed of that petition and the motion based thereon in a written opinion that day handed down, and in which we dismissed the petition and overruled appellant's motion. That opinion is reported in 269 Ky. 772, 108 S. W. (2d) 812. In the two referred to opinions rendered by us will be found a statement of the facts developed by the original trial, as well as those developed at the hearing before Judge Hamilton, and also relied on in the application before Judge Gilbert supra of date May 4, 1937. This record is an appeal from the order of Judge Gilbert overruling appellant's motion for a writ of coram nobis and dismissing his motion made therefor.

In our opinion supra, rendered on the 11th of this month, we referred to the writ of coram nobis in a brief way because it was discussed to some extent in appel-

lant's brief on that hearing. However, in that brief reference (which, however, might be considered as dictum, since the writ was not sought in that case) we took occasion to point out in a general way the office of the writ and the occasions when it could or could not be invoked. It is an ancient common-law writ, and at the time of its origin it was indiscriminately referred to as "coram nobis" or "coram vobis" dependent upon the court to which application was made for it. It has become largely in disuse in the United States, due to the fact of enacted statutory remedies whereby the same errors, intended to be reached by the writ when first established in England, could be remedied. When first declared and created, the writ was a remedy almost if not entirely invoked in civil cases; but, as will hereinafter appear, it became in the course of time available to a convicted defendant in criminal prosecutions. Section 233 of our Constitution preserves as a part of our system of laws all of those which were in force in the state of Virginia on the 1st day of June 1792, which are of a general nature and not local to that state, nor repugnant to our Constitution or laws enacted in pursuance thereto, "until they shall be altered or repealed by the General Assembly." The common law of Virginia at that time (June 1, 1792) consisted of the common law of England and of acts of Parliament in aid of the common law prior to the fourth year of the reign of James I which were not peculiarly local to that kingdom, and, of course, such laws became the common law of this Commonwealth (Kentucky). See Hunt v. Warnicke's Heirs, Hardin, 61, 62; Nider v. Commonwealth, 140 Ky. 684, 131 S. W. 1024, Ann. Cas. 1913E, 1246; Aetna Insurance Co. v. Commonwealth, 106 Ky. 864, 51 S. W. 624, 21 Ky. Law Rep. 503, 45 L. R. A. 355; Polsgrove v. Moss, 154 Ky. 408, 157 S. W. 1133; Ray v. Sweeney, 14 Bush, 1, 29 Am. Rep. 388; Adams Bros. v. Clark, 189 Ky. 279, 224 S. W. 1046, 14 A. L. R. 738, and United Drug Co. v. Theodore Rectanus Co., 248 U. S. 90, 39 S. Ct. 48, 63 L. Ed. 141. So that we are convinced that the writ herein applied for became a part of our remedial law upon Kentucky's admission into the Union, and, unless since repealed, it is yet available.

With reference to civil cases, sections 344 and 518 of our Civil Code of Practice enacted remedies, available to unsuccessful litigants in order to entitle them to take advantage of facts discovered after the term in

which judgment was rendered against them, and it might be true that such remedies superseded the common-law writ of coram nobis or coram vobis in so far as applicable to civil proceedings. However, we have held in a number of cases, among which are Wellington v. Commonwealth, 159 Ky. 462, 167 S. W. 427, Greer v. Commonwealth, 165 Ky. 715, 178 S. W. 1027, and Coldiron v. Commonwealth, 205 Ky. 729, 266 S. W. 374, that the remedies provided by those sections do not apply to criminal prosecutions and are not available to defendants accused and convicted of violations of our criminal law. We therefore conclude that the writ herein applied for is available to appellant; provided his alleged facts bring the case within the purview of the common-law writ he invokes. Its purpose was to obtain a new trial because of conditions for which the applicant was in no wise responsible and which made the record in which the complained of judgment was rendered appear regular, proper, and in conformity with law, but which the real facts, as later presented on application for the writ, rendered the original trial tantamount to none at all, and when to enforce the judgment as rendered would be an absolute denial of justice and analogous to the taking of life or property without due process of law.

Turning now briefly to the declared law as to the office and functions of the writ, we take these excerpts from the text in 2 R. C. L. composing a part of the treatment of the subject "Coram Nobis and Coram Vobis" under the general heading of "Appeal and Error": (1) "The writ of coram nobis or coram vobis was a common law writ; the purpose of which was to correct a judgment in the same court in which it was rendered." Page 305, sec. 259. (2) "Though, due to other statutory remedies, the use of the writ of coram nobis or coram vobis is not, under modern practice frequent, still it exists as a common law remedy, except where it has been abolished by statute, and, though seldom resorted to in criminal cases, it is conceded by the courts to be appropriate remedy in them as well as in civil actions." Page 305, sec. 260. (3) "A writ of coram nobis to correct an error of fact can be issued only by the same court which rendered the judgment, nor can a court by such a writ reach a judgment of a higher court affirming its own judgment." Id. (4) "It (the writ) lies to correct errors in fact only, and will

not lie to correct errors in law; nor will it lie to permit the review of a judgment for after-discovered evidence." Page 307, sec. 262.

One of the strongest presentations, for the issuing of the writ in criminal prosecutions—as is developed by the cases cited in the notes to the excerpts taken from the text of 2 R. C. L.—is where a convicted defendant was forced through fear and the terrorizing of a mob, present at the trial and demanding vengeance for the supposed outrage committed by the accused, whereby he is induced to forego a trial and to enter a plea of guilty in order to save his life. Such were the facts in what appears to be the leading case in this country on the question of the availability of the writ in criminal prosecutions, and which is Sanders v. State, 85 Ind. 318, 44 Am. Rep. 29. The opinion was written for the court by a famous outstanding judge of the Indiana Supreme Court and also extensive author of standard law books, Byron K. Elliott. The reader will need to go no farther for a full history of the writ, its scope and availability under almost any state of facts, than a consultation of Judge Elliott's opinion in that case. He reviews the opinions of the early and following English courts, together with those rendered by the various courts of the different states of this Union, relating to the subject, and his opinion clearly approves therein the principles stated in the text excerpts supra, and in which he concludes that the writ is not available, except in the character of case stated and that it can never be resorted to in order to obtain the benefit of newly discovered evidence. The accused in that case was by duress and fear compelled to enter a plea of guilty in order to escape the vengeance of a mob, and Judge Elliott said that it furnished a peculiar illustration of the original intent and purpose of the writ and that the applicant therein was entitled to avail himself of it.

Other treatments of the writ, its origin, office, and availability—as well as nonavailability—will be found in annotations in 10 A. L. R. 213, 10 A. L. R. 648, 30 A. L. R. 1416, 33 A. L. R. 84, and in the opinions immediately preceding them and to which they are attached. The annotation in 30 A. L. R. points out that the writ will not lie where the judgment of conviction has been affirmed on appeal from the trial court, and the annotation in 33 A. L. R. clearly demonstrates that the writ is not available because of perjured testimony heard at the trial, or be-

cause of newly discovered evidence made after the trial. The opinions which those annotations follow likewise so conclude. Each of the conclusions, so recorded, is supported by numerous cited cases. The annotation from 33 A. L. R. follows the case of Hmuphreys v. State of Washington, the syllabus to which says: "The writ of coram nobis does not lie to review a conviction for larceny after the lapse of the statutory period for applying for new trial because of newly discovered evidence of a confession by a stranger of Commission of the crime." The annotation thereto at its beginning says: "The rule seems to be well settled, in accord with the decision in the reported case (Humphreys v. State, [129 Wash. 309, 224 P. 937, 33 A. L. R.] 78) that a writ of error coram nobis will not lie on the ground of newly discovered evidence." The reason given by the courts which the annotator cites therein is thus formulated: "If the writ of coram nobis were allowed on the ground of newly discovered evidence, after judgment, the defendant might discover or fabricate evidence that would have been material on the trial. It would be necessary for him only to obtain the writ of error coram nobis, assign errors in fact, and proceed to try the whole matter over again. Such a practice would render the validity of the judgments of the courts too uncertain to comport with sound policy, safety or public convenience, and cannot be sustained. Bigham v. Brewer [4 Sneed (Tenn.) 432] supra."

That most forceful reason and conclusion is undeniable, and to not recognize it would open the door to total destruction of stability of judgments (a cherished principle of the law) and would result in a situation whereby litigation, including criminal prosecution, would be interminable and where finality of court proceedings would be abrogated. Therefore, the courts that have dealt with the question have never failed, so far as we have been able to discover, to disallow the writ when the applicant therefor sought the benefit of newly discovered testimony or to avoid his conviction because of perjured testimony. Much more could be said, and many other authorities could be cited, supporting the view that appellant is not entitled to the writ upon the showing he now makes, and that Judge Gilbert properly denied it, but we conclude that what we have already said is sufficiently demonstrative of that fact.

But it is urged that to deny the application in this

case would deprive appellant of "Due Process of Law," and other constitutional guarantees, and for such reason the trial court erroneously dismissed his application. We, however, cannot agree with that contention. The phrase "due process of law" as contained both in the Federal Constitution and that of this Commonwealth is difficult—yea, almost impossible—to precisely define. However, its scope is not limitless or all-embracing. Many definitions are given in cases cited under the same heading in Caldwell's Kentucky Judicial Dictionary, Volumes 1 and 3. We will insert only a few of them. " 'Due process of law' undoubtedly means, in the course of regular proceedings, according to those rules and forms which have been established for the protection of private rights." City of Louisville v. Cochran, 82 Ky. 15, 21. In the criminal case of Reed v. Com., 138 Ky. 568, 128 S. W. 874, the phrase was held to mean a trial conducted according to the rules enacted by the Legislature or adopted by the courts for the prosecution of crimes. In that case we quoted from Mr. Cooley on Constitutional Limitations, 441, in giving his definition of what constituted due process of law and in which he said that it was and is "such an exercise of the powers of the government as the settled maxims of law permit and sanction, and under such safe-guards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs." A more extended discussion of the subject we deem to be unnecessary. Clearly, the constitutional guaranty of due process of law exacts no greater demand than the rights that were accorded appellant at his trial, and which we approved when we affirmed the judgment convicting him.

Those rights were and are that the court trying him should have jurisdiction of the subject matter and of his person; that he should be tried by jury selected according to law; that he should be confronted with the witnesses against him; that he be extended the right to be represented by counsel, and given a reasonable opportunity to present his defense, and to be present at all stages of the trial; that he should have the right to an appeal to this court, and, perhaps, others not necessary to mention. All of them were accorded him according to the conclusions reached by both the trial court and this court. It surely, therefore, cannot be contended that appellant has not received the protection of the

constitutional guarantees which he now claims were denied him. He is, therefore, now in a condition where his last and final remedy is an appeal for clemency, but which the courts have no power or authority to exercise. We will not comment on, nor attempt to analyze the alleged newly discovered evidence upon which reliance is made, further than to say that it is of a nature and character, when viewed in the light of the circumstances and surroundings, to at least excite suspicion as to its truthfulness. Moreover, we have not overlooked the fact that the defendant in this application made before Judge Gilbert never appeared as a witness either in person or by affidavit, or even by any pleadings verified by him. The sum and substance of all of his alleged newly discovered testimony comes from witnesses residing in the immediate surroundings, and some of which was even known to the defendant at the time of the trial but which he did not develop, either by himself or any of the witnesses now produced by him as being newly discovered ones. Furthermore, the chief effort in his alleged newly discovered testimony was directed to impeaching two material witnesses who testified for the Commonwealth by showing that one of them was absent from the place to which she testified and who was then out of the town of Middlesboro at some outlying village; and the other a little girl whose testimony that she saw the shooting was untrue because she was, perhaps, at a place where she could not see it. That impeaching testimony is sought from the mother of the infant witness who was present at the trial, but whose present testimony is not absolutely demonstrative that her young daughter testified falsely at the trial. Furthermore, it should not be overlooked that a resort to newly discovered evidence by those accused of crime after their conviction has come to be a frequent practice for escaping inflicted punishment after conviction. Of course, there are cases entirely free from suspicion and where the ground is bona fide relied on, but it is doubtful if the showing here made can be so classified.

But, howsoever that may be, the reasons hereinbefore advanced convince us that the judgment appealed from was and is correct, and it is affirmed.

The whole court sitting.