Mark BROWN, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Supreme Court of Kentucky.

July 1, 1977.

Rehearing Denied Oct. 7, 1977.

Jack Emory Farley, Public Defender, Frankfort, Mark A. Posnansky, Asst. Public Defender, for appellant.

Robert F. Stephens, Atty. Gen., Frankfort, Robert W. Hensley, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Justice.

The appellant, Mark Brown, and his brother, James H. (Jim) Brown, III, were jointly indicted for the murder of Bryant Dudley. Cf. KRS 507.020. In a separate trial Mark was found guilty and sentenced to 20 years in prison. He appeals.

The verdict was returned under an instruction directing the jury to find the defendant guilty of murder if it believed beyond a reasonable doubt that (a) he and Jim conspired to kill Dudley, (b) in so doing Mark intended to promote or facilitate Dudley's death, and (c) pursuant to and in execution of that conspiracy and while it existed, Jim killed Dudley by shooting him with a shotgun.[1] The word "conspiracy" was defined as follows: "A conspiracy occurs when two or more persons agree that at least one of them will engage in conduct which constitutes a criminal offense or attempt to commit an offense."

Mark's counsel objected to the instruction on the conspiracy theory, and one of his principal contentions on this appeal is that the evidence was insufficient to support a finding that there was a conspiracy between Mark and Jim to kill Dudley. He contends also that the trial court erred in denying his request for an instruction on 2d-degree manslaughter (KRS 507.040, which defines this degree of homicide as "wantonly" causing the death of another).

---

1. There was also a general murder instruction (to which no objection was offered) on the theory that Mark himself killed Dudley, either intentionally or in the course of wanton conduct creating a grave risk of death under circumstances manifesting extreme indifference to human life.

Other arguments are that the trial court erred in submitting the case to the jury under an indictment that did not sufficiently charge the offense in question and in failing to instruct on the defense of intoxication under KRS 501.080. Incident to this latter point Mark contends that under the principle of *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Commonwealth had the burden of proving his sobriety as a necessary element of the crime of murder, and that in the absence of its having sustained that burden the conviction violated his right of due process. Despite, however, valiant and resourceful advocacy by his appellate counsel we find no merit in any of these points.

In May of 1976 Mark Brown had an apartment on Vine Street in Maysville, though it seems that he also had a room at his mother's home on Jersey Ridge Road. He and his brother Jim were young men and had a circle of friends who visited Mark's living quarters on Vine Street. Mark kept marijuana at the Vine Street apartment, and the evidence suggests that he was regularly engaged in selling it. At some time in April of 1976 Mark noised it about that somebody had "ripped him off" and stolen his supply of "reefers," that he thought Dudley had done it, and that he was going to "bump him off." Having received word of this talk, Dudley went to see Mark and assured him that he was not the guilty party. During this stormy meeting Mark was brandishing a .45-caliber pistol and threatening to shoot Dudley for having stolen the marijuana, but Dudley and Mark's girl-friend were able to get him calmed down and Dudley convinced him, at least temporarily, that he was not the thief.

On Sunday night, May 16, Mark began complaining to his friends that he had been ripped off again, that someone had broken into the apartment and stolen $600 or $700 worth of valuables, and that when he found out who had done it he was going to "blow their head off." On the morning following this break-in (which would be Monday, May 17) a witness named Tolle stopped in to see Mark about an automobile Mark had been wanting to buy, and Mark told him about the robbery and said if he found out who did it he would get even. Mark was extremely angry over the rip-off. On this occasion Robert Collins also was present at the apartment, and Tolle heard Collins tell Mark that he had come up there the night before and found no one at home, but had seen Dudley either on the porch or walking down the street in front of the house.

Later on during this same day (Monday, May 17) Robert Collins was riding around in an automobile with Mark, Jim and Dudley. During this ride Mark and Jim were asking Dudley if he had stolen the drugs and Mark was pointing a .45-caliber pistol in the general direction of Dudley. Dudley, incensed, denied it and said, "This is the second time you all have had me out questioning me about something like this and had a gun in my face. If you don't quit doing it, I am going to have both of you killed." At this development Collins became apprehensive and insisted that he be taken back to his own car, after which he went home.

On Tuesday, May 18, Mark told Ricky Bellew that someone had broken into his house and stolen some drugs, and he was going to "get them." During this conversation, in the course of discussing whether he knew who had done it, Mark indicated that he suspected Dudley or some other individual he did not name.

At some time around 10:30 to 11:00 P.M. of May 18 Chan Warner and Earl Black, friends of the Browns, were standing on the street in Maysville when Mark and Jim drove up in Jim's car and asked if they had seen Dudley. Warner told them that he thought Dudley was at the home of his (Dudley's) girl-friend, Anna (Pete) Corde. Either Warner or Black asked the Browns "if they had anything to get high on," to which Mark replied in the negative and explained that he "had gotten ripped off of everything he had," referring to marijuana. During this discussion Mark said he knew who had done it and that he was going to "get them." He did not, however, say that Dudley was the suspect to whom he was referring.

Anna Corde testified that Dudley had been at her home all during the evening of Tuesday, May 18, until about 10:00 or 10:30 P.M., when Mark Brown came to the door and asked for him. Dudley, who was scantily attired, put on some more clothes and told Anna he was "going up to Mark's to do some chemicals" (to "get high") and would be back in 15 minutes to half an hour. She never saw Dudley again.

Except for Mark and Jim Brown, neither of whom testified, the last persons known to have seen Dudley alive were four boys who came to Mark's apartment between 11:30 and 12:00 P.M. on Tuesday, May 18, and remained there about 15 minutes. When they arrived, Mark and Dudley were in the kitchen and, according to one of the visitors, were "snorting" something into their nostrils and staggering around. Dudley in particular was "pretty messed up." Jim was in the living room and "didn't appear to be messed up." Jim mentioned that he was about to go to Lexington, so the visitors departed.

Between 3:00 and 3:30 A.M. on Wednesday, May 19, Mark and Jim Brown arrived at an apartment in Lexington occupied by four of Jim's friends, where they slept on a couch for the rest of the night.

Later in the day after the Browns had awakened they sat around and listened to some records and then at some time after noon returned to Maysville. At one point during this visit Mark went out to his brother's car and fired a shotgun, explaining afterward that he wanted to check the safety mechanism of the gun and found that it "didn't work." Also during this sojourn in Lexington, at Jim's instance one of the other boys traded a shirt and a pair of boots with him.[2]

On Thursday afternoon, May 20, Jim Burden and Darrell Davis were in Mark's apartment and heard a conversation in which Mark, referring to the recent theft, "said he knew who it was and that it was a black person,[3] and that it was taken care of." Later on that night Davis heard that Dudley was missing.

Robert Collins, who evidently enjoyed Mark's confidence,[4] testified that on Friday, May 21, Mark called him on the telephone and told him that he (Mark) and Jim had been riding around with Dudley and had stopped out on Morton's Lane; that while they were questioning Dudley at that place Jim became "hostile" and shot Dudley with both barrels of a shotgun; and that he (Mark) had either shot or shot at Dudley a couple of times with a .45. That night, which Collins says was "between Friday night and Saturday morning . . . early in the morning," Collins accompanied Mark out to Morton's Lane in order to help him find Dudley's body and bury it. According to Collins, Mark looked along the side of the road but was not able to find the body.

At some time before Dudley's body was found Collins repeated the substance of the above described conversation with Mark to William Castle, who so testified.

On May 26, after being advised of his rights, Mark submitted to an interrogation by Detective William Lewis, of the Kentucky State Police. He admitted that he and Jim had brought Dudley to his apartment on the night of May 18 and that he and Dudley had sat in the kitchen and snorted some "angel dust," which he described as a "mixture of drugs, left-overs, more or less." Afterward, he said, Dudley and Jim helped him make up a bed in the bedroom and then Dudley left. Mark and Jim then went on to Lexington and Mark had not seen Dudley since. He denied knowing Dudley's whereabouts or having had anything to do with his disappearance.

2. It was later determined that the boots traded by Jim Brown bore traces of Type A blood, which was the same type found in blood samples recovered at the scene where Dudley's body was discovered.

3. Dudley was black. The Brown boys are white.

4. They had gone to college together, and Collins said that he "used to buy marijuana" from Mark.

Dudley's body was found just off Morton's Lane on May 27. He had been shot twice in the back with No. 6 shot from a .12-gauge shotgun. The pieces of wadding found in the body had come from Federal brand shotgun shells. No .45-caliber bullets were located, but two .45-caliber shell casings were found near the road. The weapon from which they had been ejected was not discovered. No spent shotgun hulls were found.

Jim Brown owned a .12-gauge twin-barreled shotgun at the time Dudley was killed. A search of Mark's apartment on May 29 turned up, among other things, two No. 6-shot Federal shotgun shells and an empty Federal .12-gauge shell box marked for No. 6 shot.

▆ There was more evidence, but the foregoing narrative summarizes enough to demonstrate beyond sensible question that there was abundant testimony to justify an instruction and a guilty verdict on the theory that Jim Brown killed Dudley pursuant to a prearrangement between himself and Mark that one or both of them would do it. To counsel for Mark at both the trial-court level and in this court the word "conspiracy" seems to have conjured up visions of mystery and deep significance that we find ourselves simply unable to comprehend. It is not necessary, in order to prove a conspiracy, to produce evidence of the actual conversations or communications between the conspirators. In this instance, for example, the conduct of Mark and Jim Brown during the events preceding the murder of Dudley clearly evinced a mutually-understood community of purpose. Mark had expressed an intention to "blow the head off" the thief. He thought Dudley was the culprit. Jim was with him every step of the way. He assisted in the interrogation on Monday, while Mark was brandishing a .45-caliber pistol at Dudley. He knew Mark was threatening to kill Dudley. He took Mark in his car to carry Dudley off to Mark's apartment and then to the death scene, where the accusatory interrogation continued, and in the end Jim shot and killed Dudley. From these outward circumstances it is entirely reasonable to infer that the Browns had planned and agreed on what they were going to do. But even if there had never been a spoken word between them that could be characterized as an express agreement or plan to kill Dudley, obviously the end result of their course of action was contemplated by both of them in advance and was in every sense a joint undertaking. If that did not amount to a conspiracy, the writer of this opinion has wasted nearly 40 years in the wrong profession.

Actually, Mark could more easily have been convicted as an aider and abettor. Ordinarily it is more difficult to convict an accessory before the fact than an aider and abettor, because the occasion for resorting to the accessory theory is that the defendant in question was not present at the time the crime was committed. Here, however, the accessory was present as an aider and abettor. The absence of an instruction on that theory was a gratuitous windfall in Mark's favor.

▆ We perceive no basis for an instruction on manslaughter of any degree. Had there been any evidence sufficient to create a reasonable doubt that Mark intended the death of Dudley, an instruction on 2d-degree manslaughter might have been appropriate. Mark himself was about the only person who could have provided such testimony, as only he could have known what his intention was. But he chose not to testify, and certainly he is in no position to claim that the jury should have been invited to speculate that he really did not intend to have Dudley killed, but only wanted to scare him half to death. It is our opinion that there was no evidence to raise a reasonable doubt as to whether the homicide was intentional. The only question was the identity of the guilty party or parties.

▆ Precisely the same rationale applies to the argument that Mark was entitled to an instruction to the effect that if he was so intoxicated (on drugs) at the time of the killing that he was incapable of a criminal intent he should be acquitted. As explained in *Jewell v. Commonwealth*, Ky.,

549 S.W.2d 807 (1977), intoxication is one of several defenses provided by the Kentucky Penal Code in which the burden of proof to negate the defense is cast on the Commonwealth, but in order for the defense to be raised, so as to call for an instruction placing the burden on the Commonwealth, there must be something in the evidence reasonably sufficient to support a doubt based on the defense in question. Likewise, it was further explained in *Isaacs v. Commonwealth,* Ky., 553 S.W.2d 843 (1977), that in order to call for an instruction on a lower degree of or lesser included offense within the crime charged, there must be something in the evidence reasonably sufficient to justify a doubt based on the theory that the crime committed was of a lower degree or lesser culpability. Whether one is referring to one of these affirmative "defenses" or to a lesser offense, the evidentiary situation and burden of proof are the same. Evidence suggesting that a defendant was guilty of a lesser offense is, in fact and in principle, a defense against the higher charge, though it is not a "defense" within the technical meaning of that term as used in the Kentucky Penal Code, cf. KRS 500.-070.

■ Other than the fact that Mark was "snorting" drugs with Dudley in the kitchen of Mark's apartment the night Dudley disappeared, and probably was "high", there was no evidence whatever to suggest that either then or at the time of the shooting he did not have the capacity of forming a criminal intent.

■ Whatever may be its other infirmities, *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), does not stand for the proposition that the prosecution is required to produce evidence negating every fact and circumstance that could serve either to reduce the degree of or to raise an absolute defense to the crime charged. Once there is evidence sufficient to create a doubt, yes—then the state has the burden of proof and there must be an instruction so casting it. This is true of every defense excepting those which the statutes provide may be proved by the defendant "in exculpation of his conduct." KRS 500.070. When a defense is presented in the form of an instruction on a lesser offense, there is an instruction to the effect that if the jury finds the defendant guilty but has a reasonable doubt as to the degree, it must find him guilty of the lesser. Under no circumstances does a defendant have the burden of proof, as in the instance of the Maine statute involved in *Mullaney.*

■ With respect to the question of intoxication, relative sobriety (that is, within the context of mental competency) is the usual and normal state of mankind in general. The law gives recognition to this fact of life in the form of a presumption, the effect of which is that in the absence of evidence to the contrary there is no reason to doubt that at any given time or place a defendant was in sufficient possession of his faculties to be accountable for his actions. Hence there is no occasion for an instruction on the subject. As we understand counsel's *Mullaney* argument, it is that this has the effect of casting the burden of proof on the defendant, because without any evidence either way the jury has no alternative but to proceed on the unproved premise that the defendant was not incapacitated. The answer to that contention is that unless and until there is evidence reasonably sufficient to ground a doubt in that respect the defendant's mental capacity at the time of the offense is not in issue.[5] The existence of the presumption does not impose the burden of proof on the defendant, but only the burden of showing that there is a genuine issue of fact, which is a far cry from the burden of proof.[6]

■ The indictment alleged that Mark and Jim Brown "murdered Bryant Victor

---

**5.** "*Mullaney v. Wilbur,* 421 U.S. 684 [95 S.Ct. 1881, 44 L.Ed.2d 508] (1975), does not forbid States from requiring the criminal defendant to present at least some evidence to raise a factual issue with respect to heat of passion or self-defense." *Hankerson v. North Carolina,*

—— U.S. ——, fn. 3, 97 S.Ct. 2339, 53 L.Ed.2d 306 (decided June 17, 1977).

**6.** And even when the issue is raised and an instruction is required, the initial presumption does not lose its force, in the sense of requiring the prosecution to come forth with countervail-

Dudley," without specifying the manner or means by which they did so. As counsel for Mark points out, KRS 507.020 enumerates more than one way in which murder can be committed, and RCr 6.10 requires an indictment to contain "a plain, concise and definite statement of the essential facts constituting the specific offense with which the defendant is charged." Unquestionably the indictment was defective, but that does not mean it failed to state a public offense or was insufficient to support a conviction. The old Code of Criminal Practice, under which *Duncan v. Commonwealth*, Ky., 330 S.W.2d 419 (1959), was decided, did not provide as liberally for amending indictments as do the Rules of Criminal Procedure, nor did it authorize a bill of particulars as now provided in RCr 6.22. Trial counsel for Mark having made no effort to require further specification by the Commonwealth, it is to be presumed that he was fully aware of what the prosecution intended to prove. The indictment was loose, but not invalid. See *Wylie v. Commonwealth*, Ky., 556 S.W. 2d 1 (1977).

The judgment is affirmed.

All concur.

ing proof, "unless the evidence tending to support the defense is of such probative force that [otherwise] the defendant would be entitled to a directed verdict of acquittal." KRS 500.-070(1).