James H. BROWN, III, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Supreme Court of Kentucky.

Aug. 31, 1982.

Rehearing Denied Nov. 2, 1982.

Jack Emory Farley, Public Defender, Kevin Michael McNally, M. Gail Robinson, Asst. Public Defenders, Frankfort, for appellant.

Robert F. Stephens, Atty. Gen., J. Gerald Henry, Asst. Atty. Gen., David A. Smith, Sp. Asst. Atty. Gen., Frankfort, for appellee.

## OPINION OF THE COURT

The appellant, James H. (Jim) Brown, III, and his brother, Mark Brown, were jointly indicted for the murder of Bryant Dudley. Cf. KRS 507.020. In a separate trial Mark was found guilty and sentenced to 20 years in prison. His conviction was affirmed by this court in *Brown v. Commonwealth,* Ky., 555 S.W.2d 252 (1977). That opinion will serve as a sufficient background for understanding this case without a detailed account of the evidence in this opinion.

Jim Brown's separate trial also resulted in a verdict of guilty and a sentence of 20 years' imprisonment, which gives rise to this belated appeal.

With two major differences the evidence in Jim's trial was much the same as it was

in Mark's. Mark was done in by the testimony of Robert Collins, who said that Mark had confided in him and admitted that he and Jim had killed Dudley. This evidence, of course, was not admissible against Jim. In Jim's trial, on the other hand, there was expert evidence that blood found on Jim's boots was not his blood but could have been Dudley's. That evidence was not introduced in Mark's trial.

To summarize the events, it will be recalled that Mark strongly suspected that Dudley had stolen a quantity of marijuana from his apartment in Maysville, and was threatening to shoot him. On the night of Monday, May 17, 1976, Jim, Mark and Robert Collins went riding in Jim's automobile and picked Dudley up. As they continued riding around with Jim driving, Mark displayed a .45-caliber pistol and, pointing it in the "general direction" of Dudley, questioned him with regard to the theft of drugs from Mark's apartment. Collins became apprehensive and asked that he be taken back to his car, which was done. When Collins parted company with them, Mark, Jim and Dudley were still together. On the next night, Tuesday, May 18, 1976, Jim and Mark were in Jim's car on 4th Street in Maysville and indicated to Chan Warner and Earl Black that they were looking for Dudley. Shortly thereafter they found him at the home of his girl friend, Anna Corde, and he left with them in Jim's car. Later on, between 11:30 and midnight, four boys came to Mark's apartment but stayed only a few minutes because the Browns were planning to go to Lexington. Dudley was in the kitchen with Mark "snorting something," and appeared to be "high." Jim, on the other hand, was sitting on a chair in the living room and appeared to be normal. So far as we know from the evidence, this was the last time anyone other than Jim and Mark Brown saw Dudley alive.

At 3:00 or 3:30 in the morning (Wednesday, May 19, 1976) Jim and Mark arrived at the apartment of several friends in Lexington, Kentucky, about 65 miles from Maysville, and went to bed on a couch. Wednesday was Jim's usual off-day from work, and

he had made similar visits on several previous occasions, usually arriving, however, on Tuesday evening. Mark had not accompanied him before. Later on during this particular day, after the Brown boys had arisen they played cards and listened to records with some of their hosts, after which Mark cleaned out Jim's car and disposed of some trash. During this activity Mark fired a shotgun which he or Jim, or both, had in the automobile, explaining afterward that he had been testing a defective safety mechanism. Sometime in the middle of the day, around noon or 1:00 P.M., Jim, Mark and a young man named Hutchison went over to Hutchison's nearby apartment and Jim asked Hutchison if he wanted to buy a pair of boots. Hutchison said no, but that he had an old pair he would trade for them. Jim thereupon traded his boots for the old boots, and also traded the shirt he was wearing for one of Hutchison's shirts. According to Hutchison, Jim gave no explanation for wanting to make these exchanges. Later, however, after Hutchison began to hear rumors (after discovery of the murder, presumably) he took a good look at the boots, which he had not worn, and discovered a stain or stains on them. Eventually, after being questioned by investigative officers, Hutchison turned the boots over to a detective. A laboratory examination disclosed the presence of Type A human bloodstains on the boots. Both Jim Brown and Dudley had Type A blood.

In the early morning hours before daylight on Saturday, May 23, 1976, Mark and Robert Collins borrowed an automobile and went out to the scene of the crime for the purpose of burying Dudley's body, but were unable to locate it. According to Collins, Mark "could not remember where it was, where they killed him." Jim Brown did not take part in this expedition.

On May 27 Dudley's badly-decomposed body was found by the side of a country lane near Maysville. His death had resulted from two side-by-side shotgun wounds in the back. It was established that these wounds had been inflicted by No. 6-size shot fired from a .12-gauge shotgun. Pieces of

wadding recovered from the body were identified as having come from Federal brand shotgun shells. Jim Brown owned a double-barreled .12-gauge Stevens shotgun that was capable of firing both barrels simultaneously. It had a defective safety-device. There were some Federal .12-gauge shells in his mother's home, where he resided. Blood from various objects recovered at the death scene was of Type A. Tire marks indicating where an automobile had recently stopped were similar to the treads on the tires of Jim Brown's automobile.

▮ It is our opinion that the evidence thus far summarized was sufficient to justify the conviction of Jim Brown in the killing of Dudley at some time during the interval of three hours or so from the departure of the four visitors from Mark's apartment between 11:30 P.M. and midnight on Tuesday, May 18, until the arrival of Mark and Jim in Lexington at 3:00 or 3:30 in the morning of Wednesday, May 19. There was further testimony by one Conley, who had been in jail with the Browns in July of 1976 after being arrested for public intoxication, to the effect that they offered him $1,000 to kill Robert Collins, but we do not need to rely upon it in reaching our conclusion with regard to the sufficiency of the evidence to warrant the conviction. Brown was not entitled to a directed verdict of acquittal. Cf. *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530, 532 (1977).

▮ It is insisted with much vigor that the trial court committed prejudicial error in admitting expert opinion testimony from Robert Shaler, PhD, a research assistant professor at the University of Pittsburgh, reflecting his conclusions with reference to blood samples drawn from Jim Brown as compared with the blood stains on his boots and with blood stains on the victim's clothing. In addition to a doctorate in bio-chemistry, Dr. Shaler had taken graduate training in forensic science, had served for several years as a criminalist and research director at the Pittsburgh and Allegheny County Crime Laboratory, and since 1974 had been engaged in an LEAA-financed project to study the individualization of blood stains.

The method used by Dr. Shaler in comparing and differentiating blood samples depended on the identification of certain genetic factors in the blood. It is premised upon the existence of 23 "GM antigenics," some but not necessarily all of which will be consistently present in the serum of an individual person's blood. The laboratory in which Dr. Shaler worked had the capability of identifying three of these, which he designated as GM Nos. 1, 4 and 12. Only No. 4 was found to be present in the blood from Jim Brown's boots and the blood from Dudley's clothing, whereas the blood-sample drawn from Jim Brown contained both No. 4 and No. 12. Hence the presence of No. 12 served to differentiate Jim Brown's blood from that found on his boots and in Dudley's clothing. It was possible, therefore, that the blood on the boots came from Dudley, but not possible that it came from Brown. Testifying in chambers prior to the admission of this testimony before the jury, Dr. Shaler explained the development of the GM system and gave his professional opinion that it is reliable. Though counsel for Brown was at some disadvantage in having had a limited time to prepare himself on the subject, he conducted a skillful and penetrating cross-examination in the presence of the jury which was well-calculated to make the point that this particular method of blood-testing is more or less in its infancy in this country and has not yet come into general acceptance and use.

Our opinion is that the only valid argument to be made against the Shaler evidence is addressable to its credibility rather than its admissibility. "Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion." McCormick, *Evidence*, 203 (2d ed. 1972). It is not to be likened to the lie-detector test, the results of which depend heavily on the skill of the operator, and in which factors other than truthfulness are known to affect the result. Dr. Shaler's testimony was admissible on the same basis as any other expert opinion.

■ We were at first somewhat disturbed by the trial court's refusal to grant a continuance in order for defense counsel to research the blood-grouping theory. Defense counsel spoke with Dr. Shaler on Saturday before the trial commenced on Monday. At that time, Dr. Shaler indicated a hesitancy to testify, stating that his tests were inconclusive. He had been contacted by the Commonwealth only on Friday, and continued testing throughout the weekend. Defense counsel was certainly aware that he might testify, yet made no motion for a continuance until the Commonwealth called Shaler as its last witness. Moreover, when presented with the opportunity during cross-examination, defense counsel failed to question Shaler about the doubts expressed in the Saturday conversation. We cannot conclude that Jim Brown was unfairly prejudiced by the trial court's refusal to grant a continuance.

■ We find no merit in the remaining issues related to the conduct of the trial. However, one procedural exercise remains. KRS 532.050 requires a presentencing investigation and consideration of a written report of such investigation. The trial court is required also to inform the defendant or his counsel of the facts and conclusions of the investigation and afford him opportunity to controvert them. The record does not disclose whether an investigation or report was requested or considered. The requirement is mandatory and must precede the entry of a valid judgment. *Brewer v. Commonwealth*, Ky., 550 S.W.2d 474 (1977).

The judgment is vacated and the case remanded to the Mason Circuit Court for resentencing upon compliance with KRS 532.050.

All concur except STEPHENS, J., not sitting.