James H. BROWN, III, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 94–SC–1036–DG.

Supreme Court of Kentucky.

Aug. 29, 1996.

Rehearing Denied Nov. 21, 1996.

Gail Robinson, Kevin McNally, McNally & Robinson, Frankfort, for appellant.

A.B. Chandler, III, Attorney General, Todd D. Ferguson, Assistant Attorney General, Frankfort, for appellee.

KEVIN HABLE, Special Justice.

Appellant, James Brown, appeals the denial by the Mason Circuit Court of his motion made pursuant to CR 60.02(f) to set aside his conviction. The Court of Appeals affirmed the denial of Appellant's motion. For the reasons set forth below, we affirm the order of the trial court and the Court of Appeals.

Appellant and his brother, Mark Brown, in separate trials, were convicted in 1976 of the murder of Bryant Dudley and each conviction was appealed. This Court affirmed the conviction of Mark Brown in *Brown v. Commonwealth*, Ky., 555 S.W.2d 252 (1977). Although this Court found no reversible errors in the trial of Appellant, the Court remanded to the trial court to comply with the presentencing requirements set forth in KRS 532.050. *Brown v. Commonwealth*, Ky., 639 S.W.2d 758 (1982), *cert. denied*, 460 U.S. 1037, 103 S.Ct. 1428, 75 L.Ed.2d 788 (1983).

Appellant, who was apparently free on bond during the pendency of his appeal, fled to Australia, where he lived for several years. Although the record is not clear on this matter, Appellant apparently was extradited and was sentenced in 1993 to twenty years imprisonment. In 1993, Appellant filed a motion pursuant to CR 60.02(f) to set aside his conviction because the Commonwealth's expert witness in Appellant's trial indicated to defense counsel that portions of his testimony could have been erroneous. The trial court denied that motion. Thus the appeal.

This Court set forth a detailed description of the evidence in this case in *Brown*, 639 S.W.2d at 759–60. Therefore, a summary will suffice for our purposes.

Mark Brown believed that the victim, Dudley Bryant, had broken into Mark's home and stolen drugs from him. Mark Brown and Appellant took the victim for a ride in Appellant's car on the evening of May 17, 1976, during which time Mark Brown questioned the victim about the drug theft while brandishing a handgun. The following night, May 18, 1976, Mark Brown and Appellant stopped by the victim's girlfriend's house, where they found the victim. The victim left with the Brown brothers in Appellant's car and went to Mark Brown's home. Four visitors to Mark Brown's home saw Mark Brown, Appellant and the victim there together. The visitors were told that Mark Brown and Appellant were planning to go to Lexington later that night.

The Brown brothers travelled to Lexington later that night, where they spent the night with friends. The next day, Mark went to Appellant's car and fired a shotgun, allegedly to test the shotgun's safety mechanism. Later that day, May 19, 1976, Appellant traded his boots to one of his Lexington friends. Those boots were stained with type A blood, the blood type of Appellant and the victim.

A few days later, Mark Brown called a friend, Robert Collins, in Mason County, and asked Collins to help him locate and bury the victim's body. Mark Brown took Collins to Morton's Lane in Mason County and told Collins that the Morton's Lane area is where "they" had shot the victim. Mark Brown and Collins did not find the body.

Afterwards, the police did find the body off Morton's Lane. Death was caused by two wounds in the back from a side-by-side shotgun. A police witness at Appellant's trial testified that the wound was inflicted by a No. 6 shot fired from a .12 gauge shotgun. The witness identified the shotgun-shell wadding as having come from Federal brand shotgun shells.

The evidence also showed that Appellant owned a side-by-side, double-barrelled Stevens .12 gauge shotgun, which had a defective safety mechanism. Authorities recovered Federal .12 gauge, No. 6 shot shotgun shells from Appellant's mother's house, where he resided. Tire marks similar to the tires on Appellant's car were found near the victim's body.

In addition to the above-described evidence, the Commonwealth produced expert testimony at Appellant's trial. Dr. Robert Shaler studied blood samples and concluded that based on the presence or absence of specific genetic markers in the samples, that the blood found on Appellant's boots was found in only 4.6% of the population and could not have been the blood of Appellant. Dr. Shaler did not testify that the blood on the boots belonged to the victim and he did not rule out the possibility that the blood stain could have been the blood of a third person. Furthermore, the defense presented no evidence at trial that the blood stain on the boots was Appellant's.

Defense counsel interviewed Dr. Shaler in 1993. At that time, according to the affidavit of defense counsel, Dr. Shaler indicated that he was mistaken in asserting that the blood stain on the Appellant's boots could not have belonged to Appellant. The affidavit formed the basis for Appellant's motion pursuant to Rule 60.02(f) to vacate his conviction. The trial court declined to hold an evidentiary hearing but assumed defense counsel's affidavit to be a true reflection of Dr. Shaler's thinking about his earlier testimony. The trial court denied Appellant's motion because "the exclusion of the testimony of ... Shaler would in all probability not have affected the verdict of the jury." The court noted that "[i]n view of the overwhelming evidence, Shaler's testimony was not crucial to the Commonwealth's case."

The Court of Appeals affirmed, citing among other things, the prior appeal of Appellant to this Court. In 1982, this Court ruled that Dr. Shaler's testimony was admissible in Appellant's trial. The Court stated that questions raised on appeal surrounding the testimony related to the credibility and weight of the testimony rather than its admissibility. *Brown*, 639 S.W.2d at 760. In discussing the evidence, the Court noted the evidence summarized above, *without Dr. Shaler's testimony,* "was sufficient to justify the conviction of Jim Brown...." *Id.*

Notwithstanding the earlier ruling, Appellant now attempts to characterize Dr. Shaler as the key witness against him and suggests that Shaler's testimony had a "scientific aura," which might have led the jury to accept it without doubt or question.

Rule 60.02(a) through (e) provides that "a court may, upon such terms as are just, relieve a party ... from its final judgment, order or proceeding" if one or more of several circumstances are present, including: mistake, inadvertence, surprise or excusable neglect; newly discovered evidence that could not, with due diligence, have been discovered in time to move for a new trial; perjury; fraud affecting the proceedings; the judgment being void, satisfied, released, discharged or overturned. Subsection (f) of CR 60.02 also provides for relief for "any other reason of an extraordinary nature justifying relief."

Generally, CR 60.02(f) stands in the place of the ancient writ of *coram nobis.* To have a judgment set aside in a *coram nobis* proceeding, a petitioner had to convince the court that "the real facts as later presented on application for the writ, rendered the original trial tantamount to none at all, and [enforcement of] the judgment as rendered

would be an absolute denial of justice and analogous to the taking of life or property without due process of law." *Jones v. Commonwealth*, 269 Ky. 779, 108 S.W.2d 816, 817 (1937), cited in *Gross v. Commonwealth*, Ky., 648 S.W.2d 853, 855 (1983). In *Gross*, this Court made it clear that Rule 60.02 did not extend the scope of remedies available under *coram nobis* or add new grounds of relief. *Gross* at 856.

■■■ This Court has held that actions under CR 60.02 are addressed to the "sound discretion of the court and the exercise of that discretion will not be disturbed on appeal except for abuse." *Richardson v. Brunner*, 327 S.W.2d 572, 574 (1959). Rule 60.02(f) "may be invoked only under the most unusual circumstances...." *Howard v. Commonwealth*, 364 S.W.2d 809, 810 (1963); *see also, Cawood v. Cawood*, 329 S.W.2d 569 (1959) and relief should not be granted, pursuant to Rule 60.02(f), unless the new evidence, if presented originally, would have, with reasonable certainty, changed the result. *See, Wallace v. Commonwealth*, 327 S.W.2d 17 (1959). A review of the evidence at Appellant's trial fails to convince us that the outcome would have been different if all of Dr. Shaler's testimony had been excluded or if it had been admitted and Shaler's later misgivings had been available to the jury at the time of trial.

As the summary of the evidence shows, there was ample circumstantial evidence in the record upon which the jury could have based its verdict. Indeed, as noted above, this Court has earlier concluded that the evidence at trial, absent the testimony of Shaler, was sufficient to convict Appellant Brown, *supra* at 760.

Moreover, when Dr. Shaler's testimony (the testimony on direct examination) is taken as a whole, it is clear that Dr. Shaler's testimony was not the key piece of evidence against Appellant. Indeed, it appears not to have been an important item of evidence.

Dr. Shaler was subjected to intrepid and effective cross-examination by defense counsel. On cross-examination, Dr. Shaler admitted that his particular blood analysis was novel and that it had been accepted as expert evidence in only one other homicide case in the United States (and that case involved Dr. Shaler himself as the expert witness). Shaler had testified that only 4.6% of the nation's population had the particular blood markers found by him in the sample he studied. Defense counsel elicited from Shaler the admission that he had based this conclusion on a *county-wide* population survey in *Pennsylvania*. Dr. Shaler also admitted during cross-examination that he did not know whether the blood found on Appellant's boots belonged to the victim. Shaler also conceded that the blood could have belonged to a third party. Moreover, Dr. Shaler, during cross-examination, stated that he had conducted testing with respect to only three blood antigens, when there are as many as 23 separate blood antigens that can be analyzed.

Appellant's contention that Dr. Shaler was the key witness against Appellant is severely undermined by the conduct of counsel who defended Appellant at trial and of the Commonwealth Attorney who prosecuted the case. Neither even referred to Dr. Shaler or his testimony in closing argument to the jury.

■■ Of course, there is a danger that expert witness testimony can, on occasion, be given undue weight by a jury. Likewise, this Court must be sensitive to the possible injustice of convicting and incarcerating on the basis of discredited expert testimony, a man who might be innocent. Nevertheless, "we must not underestimate a jury's intelligence in its ability to discern between the multitude of evidence and testimony presented to it and to evaluate such accordingly." *Turner v. Commonwealth*, Ky., 914 S.W.2d 343, 347 (1996).

■■■ We note also that the judge who denied Appellant's Rule 60.02(f) motion in 1993 presided over Appellant's trial in 1976. He saw Dr. Shaler testify at trial and was thus in an excellent position to evaluate the import of Shaler's testimony. His judgment should be afforded deference under the abuse-of-discretion standard of review. Nevertheless, even if one disagrees with his conclusion that the other evidence in the case was "overwhelming," it is obvious that the inclusion of Dr. Shaler's misgivings in the

evidence or the exclusion of Dr. Shaler's testimony from the original trial altogether would not, with reasonable certainty, have altered the outcome. Therefore, the order of the trial court and the opinion of the Court of Appeals are affirmed.[1]

GRAVES, WINTERSHEIMER, JJ., and C. MICHAEL REYNOLDS, S.JJ., concur.

JACKSON WHITE, S.J., dissents by separate opinion, with LAMBERT and STUMBO, JJ., joining that dissent.

JACKSON W. WHITE, Special Justice, dissenting.

I must respectfully dissent.

I am persuaded that the proper standard of review of the CR 60.02(f) motion includes a determination of whether there was a fundamental miscarriage of justice in the trial and conviction of James E. Brown, III for wanton murder. The majority of this Court focuses solely upon the sufficiency of other incriminating evidence to uphold the conviction. However, this approach fails to assess the probable impact of the recanted testimony of Dr. Robert Shaler upon the constitutional right of Mr. Brown to a fair trial. I am convinced that James Brown suffered substantial injustice of an "extraordinary nature" as contemplated by CR 60.02(f) and the judgment of conviction should be vacated.

The trial court characterized the evidence against James Brown as "overwhelming" and concluded that the exclusion of Dr. Shaler's testimony "would in all probability not have affected the verdict of the jury." The basis of this determination by the trial court was that Mark Brown, James Brown's brother, was convicted on the same testimony introduced in James Brown's trial without the testimony of Dr. Shaler. The exception the trial court found was that "in the Mark Brown case the admissions of Mark Brown were introduced in full whereas in the James Brown case the admissions were limited to Mark Brown's inability to find the body...."

The trial court was clearly erroneous in this characterization of the evidence against James and Mark Brown. In Mark Brown's appeal of his conviction, this Court noted that the evidence against Mark Brown was "abundant." *Brown v. Commonwealth*, Ky., 555 S.W.2d 252, 256 (1977). We made no such determination in our decision in James Brown's case. *Brown v. Commonwealth*, Ky., 639 S.W.2d 758 (1982). Most importantly, "Mark was done in by the testimony of Robert Collins, who said that Mark had confided in him and admitted that he and Jim had killed Dudley." *Brown v. Commonwealth*, Ky., 639 S.W.2d 758, 759 (1982). There was no such testimony in James Brown's case.

Both the majority of this Court and the trial court refer to the testimony of Robert Collins as additional evidence against James Brown. Collins attributed a statement to Mark Brown that implicated James Brown in the murder. However, this statement was clearly inadmissible, and we so indicated in our original opinion: "This evidence, of course, was not admissible against Jim." *Brown v. Commonwealth*, Ky., 639 S.W.2d 758, 759 (1982).

The Court of Appeals merely relied upon this Court's earlier determination that there was sufficient evidence to sustain James Brown's conviction without Dr. Shaler's testimony. Likewise, the majority of this Court places great emphasis on our previous determination of the sufficiency of the evidence against James Brown: "In discussing the evidence, the Court noted the evidence summarized above, *without Dr. Shaler's testimony*, 'was sufficient to justify the conviction of Jim Brown....'" Majority Opinion at p. 361.

The question now before us is no longer the *sufficiency* of the evidence absent Dr. Shaler's testimony or whether "there was ample circumstantial evidence in the record on which the jury *could* have based its verdict." Majority Opinion, p. 361 (emphasis added). Rather, the question is the likeli-

1. Appellant also contends that the trial court erred in failing to conduct an evidentiary hearing concerning his Rule 60.02(f) motion. The trial court, however, accepted as true all of the factual allegations made by Appellant regarding Dr. Shaler's misgivings about his earlier testimony. Thus, the trial court did not abuse its discretion in declining to hold an evidentiary hearing.

hood that this highly persuasive scientific evidence at the original trial changed the result. Our previous determination regarding the sufficiency of the evidence means only that if James Brown's conviction were vacated, there is sufficient evidence for him to be retried.

The survival of the common law writ of coram nobis for relief in a criminal case through civil code provisions was considered by this Court in *Anderson v. Buchanan*, 292 Ky. 810, 168 S.W.2d 48 (1943). In that case, the Court reviewed the denial of a motion presented by one of three men sentenced to die from the infamous Marian Miley murder trial in the Fayette Circuit Court. This Court determined the petition disclosed "that there may have been a miscarriage of justice." *Id.*, 168 S.W.2d at 54.

At the trial, two of the accused testified that movant Anderson participated in the brutal murders of a young Lexington Country Club golf pro and her mother during the course of a burglary of their apartment at the club. In a deposition filed with the motion seeking a writ of coram nobis, Penney, one of the condemned men, claimed to have taken and used Anderson's automobile on the fateful night without Anderson's knowledge or consent. Penney testified that in perpetrating the crime he was accompanied by a man named Stewart, not by Anderson as he had previously sworn at the trial. Another condemned man, Baxter, avowed in his deposition accompanying the motion that he could not say it was Anderson he saw with Penney the night of the murder, contradicting his positive identification of Anderson at trial.

Apart from the positive identification and implication of Anderson in the commission of the murders by the convicted perpetrators, Penney and Baxter, the remaining evidence bears a remarkable resemblance to the other incriminating evidence against James E. Brown, III:

Anderson: The pistol from which the fatal bullet was fired belonged to Anderson.

Brown: The victim was killed by two simultaneous shotgun blasts from Federal brand shells; Brown owned a double-barrelled shotgun with a defective safety capable of firing simultaneous shots and Federal shells were found at the home of Mr. Brown's mother, where Mr. Brown lived.

Anderson: A witness identified Anderson as looking for Baxter on the fatal night.

Brown: The victim was last seen alive in the home of Mark Brown, where both Mark and James Brown were present.

Anderson: Anderson and Penney were sighted together in Anderson's car which Anderson was seen driving on the night of the murders.

Brown: On two different occasions, the victim accompanied Mark Brown in an automobile owned and driven by James Brown; tire prints near the scene were similar to the tires of this automobile.

Anderson: Anderson did not take the stand to deny any of the testimony against him.

Brown: Brown did not take the stand to deny any of the testimony against him.

The trial court erroneously characterized this evidence against James Brown as "overwhelming." Conversely, the majority of the *Anderson* Court characterized the sufficiency of the evidence to convict in that case as "problematical" and held:

> The court in which a conviction was had has discretion to grant the writ where it appears that but for alleged false testimony or undiscovered evidence of such a conclusive character that the verdict *most probably* would not have been rendered and there is a *strong probability* of a miscarriage of justice unless the process be granted....
>
> .     .     .     .     .
>
> The question of the guilt or innocence of the accused is not a necessary subject of the inquiry.

*Anderson v. Buchanan*, 292 Ky. 810, 168 S.W.2d 48, 53–54 (1943).

I do not believe that a jury would have found James Brown guilty of murder beyond a reasonable doubt without the following testimony of Dr. Robert Shaler:

Q: The blood from the suspect [James Brown] matched the blood on the boots?

A: No sir. The blood from the victim matches that which is on the boot, as far as the GM blood typing is concerned.

Q: From your GM blood typing sir, was it possible that the blood on the boot was the blood of James Brown, the defendant?

A: *It is impossible.*

Q: Is it possible that it was the blood of Bryant Dudley, the victim?

A: It is possible.

Q: What percentage of the population has the blood consistent with the blood of the victim?

A: ... [T]his particular blood occurs in about 4.6, approximately 4.6 percent of the population.

An "aura of special reliability and trustworthiness," surrounds scientific or expert testimony in the eyes of a jury, especially within the context of a criminal trial. *Hester v. Commonwealth,* Ky., 734 S.W.2d 457 (1987) (citation omitted). Dr. Shaler positively excluded James Brown as the source of the blood stain on James Brown's suspicious boot and, as the Majority Opinion fails to mention, just as positively identified the victim, Bryant Dudley, as one of about four sources in a hundred candidates. For this jury in this trial, there were only two relevant sources of the relatively rare blood: James E. Brown, III and Bryant Dudley. According to Dr. Shaler, it was impossible that the blood came from James Brown and the odds that it came from Bryant Dudley were high. Dr. Shaler's unequivocal exclusion of James Brown as the blood source provided a compelling link connecting James Brown to the brutal murder of Bryant Dudley.

I strongly disagree with the majority that "it is clear that Dr. Shaler's testimony was not the key piece of evidence against Appellant. Indeed, it appears not to have been an important item of evidence." On appeal of James Brown's conviction, this Court equated the evidence at issue here, Dr. Shaler's testimony regarding the blood on James Brown's boots, to testimony in Mark Brown's trial that Mark Brown had admitted he killed Bryant Dudley:

Mark was done in by the testimony of Robert Collins, who said that Mark had confided in him and admitted that he and Jim had killed Dudley. This evidence, of course, was not admissible against Jim. In Jim's trial, on the other hand, there was expert evidence that blood found on Jim's boots was not his blood but could have been Dudley's. That evidence was not introduced in Mark's trial.

*Brown v. Commonwealth,* Ky., 639 S.W.2d 758, 759 (1982). Evidence equivalent to an admission of guilt is by no means unimportant.

I also disagree with the majority's conclusion that Dr. Shaler's role in the conviction of James Brown was not significant because neither his counsel nor the prosecutor referred to the witness or his testimony in closing argument. Throughout these proceedings, James Brown and his counsel have treated the testimony as significant. At trial, counsel for James Brown requested a continuance when Dr. Shaler was called as the last witness for the prosecution. James Brown's counsel challenged this evidence in the former appeal. Indeed, the principal contention urged for reversal of the conviction in the earlier appeal focused on the admissibility of this evidence. Counsel for James Brown even sought a writ of certiorari from the United States Supreme Court on this very issue. *Brown v. Commonwealth,* 460 U.S. 1037, 103 S.Ct. 1428, 75 L.Ed.2d 788 (1983).

In closing argument, defense counsel strategically avoided a direct attack on the "blood" evidence:

[T]hen one other thing, blood, that seems to be the big thing in this trial, the blood. Now if Jimmy Brown killed a man with a shotgun, drug his body up over an embankment, wouldn't there be more blood on him than the little bit on his shoes?

On the other hand, the prosecutor skillfully pointed to this testimony in his closing:

Ladies and gentlemen, the reason he [James Brown] wanted to trade boots was because his boots had Bryant Dudley's blood on them....

There is no use mentioning all of the other one out of 25 people [approximately 4.6% ] who had the blood that Bryant Dudley had was found on Jim Brown's boots.

For the majority to conclude that the erroneous expert testimony of Dr. Shaler, offering the only direct evidence connecting James Brown to the murder of Bryant Dudley, was an insignificant factor in his conviction substitutes judicial clairvoyance for a fair and impartial trial by jury on reliable evidence.

LAMBERT and STUMBO, JJ., join this dissent.