**James H. BROWN, III, Petitioner–Appellant/Cross–Appellee,**

v.

**Michael O'DEA, Warden, Eastern Kentucky Correctional Complex, Respondent–Appellee/Cross–Appellant.**

**Nos. 97–6355, 97–6425.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 26, 1999.

Decided Aug. 5, 1999.

Gail Robinson (argued and briefed), Kevin M. McNally (briefed), McNally & Robinson, Frankfort, KY, for Petitioner–Appellant/Cross–Appellee.

Todd D. Ferguson (argued and briefed), Office of the Attorney General, Criminal Appellate Division, Frankfort, KY, for Respondent–Appellee/Cross–Appellant.

Before: MERRITT and MOORE, Circuit Judges; DUGGAN,* District Judge.

DUGGAN, D. J., delivered the opinion of the court. MERRITT (pp. 580–83), and MOORE (pp. 583–87), JJ., delivered separate concurring opinions.

DUGGAN, District Judge.

This matter is before the Court on petitioner's appeal from the district court's dismissal of his 28 U.S.C. § 2254 petition for writ of habeas corpus. Petitioner is currently incarcerated at the Eastern Kentucky Correctional Complex.

Petitioner filed a § 2254 petition for writ of habeas corpus in the United States District Court for the Eastern District of Kentucky, challenging his conviction in Kentucky state court for murder, for which he was sentenced to twenty years imprisonment. The district court denied the petition; however, it granted a certificate of appealability so that petitioner could appeal the court's denial of the writ. This appeal ensued.

Petitioner and his brother, Mark Brown, were convicted in 1976 of the murder of Bryant Dudley. Petitioner was sentenced to twenty years imprisonment on October 15, 1976 but released on a state court bond pending appeal on October 30, 1976. On October 5, 1977, the Kentucky Supreme Court dismissed petitioner's direct appeal as untimely. On October 31, 1977, petitioner filed a petition for writ of habeas corpus contending that the dismissal of his direct appeal was in error. On February 6, 1978, the district court denied petitioner's application due to his failure to exhaust his state court remedies, but retained the case on its docket pending exhaustion of those remedies.

The Kentucky Supreme Court granted petitioner's motion for a belated appeal on March 17, 1978, but dismissed it on August 22, 1978. On August 24, 1978, petitioner filed a motion to reconsider his petition for writ of habeas corpus in the district court. The state court resentenced petitioner to twenty years imprisonment on September 5, 1978. On June 27, 1979, the district court granted petitioner a conditional writ of habeas corpus, but stayed the writ for a period of sixty days so that petitioner's appeal to the Kentucky Supreme Court could be reinstated. The district court order stated that if petitioner's appeal were not reinstated, petitioner's conviction would be set aside. This Court affirmed that judgment and the United States Supreme Court denied Brown's petition for writ of certiorari. *Brown v. Smith*, 633 F.2d 213 (6th Cir.1980), *cert. denied*, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858 (1981).

The Kentucky Supreme Court ultimately affirmed Brown's conviction on August 31, 1982, but remanded the case to the state trial court for resentencing following a presentence investigation. Resentencing never took place, however, because Brown, who was still free on appeal bond, became a fugitive from justice in Australia for more than ten years. In January 1993, the Commonwealth of Kentucky filed a motion for a bench warrant, which was executed by Brown's arrest in May 1993

* The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

when he was extradited. On June 23, 1993, petitioner filed a motion pursuant to Kentucky Civil Rule 60.02(f) to vacate the seventeen-year old judgment against him based upon the allegedly improper admission of expert testimony at trial. In July 1993, a state trial court denied the motion. The Kentucky Court of Appeals affirmed the trial court's denial of Brown's Rule 60.02(f) motion in December 1994. The Supreme Court of Kentucky granted discretionary review and also affirmed the trial court's decision.

On July 20, 1994, petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Commonwealth moved to dismiss the petition for failure to exhaust all available state court proceedings on the issue of the admission of certain controversial testimony at trial. The Commonwealth noted that the appeal from the denial of petitioner's Rule 60.02(f) motion regarding this testimony was pending in the Kentucky Court of Appeals and requested that the petition be dismissed without prejudice.

On September 22, 1994, a federal magistrate judge advised the district court in a Report and Recommendation that the Commonwealth's request should be granted. The district court entered a judgment adopting the magistrate judge's report on October 18, 1994, and this Court affirmed the district court's denial of a certificate of probable cause to appeal on January 23, 1995. On November 21, 1996, all available state court proceedings were exhausted pertaining to the issue of the controversial testimony when the Supreme Court of Kentucky denied Brown's petition for rehearing and its earlier opinion became final.

Petitioner's current petition for writ of habeas corpus was filed on February 12, 1997. In response, the Commonwealth filed a Motion for Summary Judgment.

The district court adopted, as its decision, the Report and Recommendation of the magistrate judge in which he construed the instant petition as a second or successive petition, concluded that such a filing constituted an abuse of the writ, and recommended dismissal of the petition. Petitioner asserts two points of error with respect to the conclusions of the magistrate judge. First, petitioner contends that the district court erred in *sua sponte* dismissing the petition for abuse of the writ because the instant petition does not constitute a second or successive petition. Second, petitioner claims that the district court erred in determining that the statute of limitations in the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA") is applicable to the petition. We find that the district court erred in dismissing the petition on procedural grounds.

■ The district court construed the petition as a second or successive petition because petitioner's initial application for writ of habeas corpus filed on July 20, 1994, was dismissed without prejudice for failure to exhaust the second issue on which petitioner sought habeas relief. In *Carlson v. Pitcher*, 137 F.3d 416 (6th Cir. 1998) we addressed the proper characterization accorded a second petition filed subsequent to a dismissal without prejudice for failure to exhaust.

> We join with every other court to consider the question, and hold that a *habeas* petition filed after a previous petition has been dismissed on exhaustion grounds is not a "second or successive" petition implicating the pre-filing requirement of obtaining an order of authority from the court of appeals.

*Carlson*, 137 F.3d at 420.

Applying the holding of *Carlson* to the instant petition, we conclude that it is not a second or successive petition. The 1994 petition was dismissed without prejudice for failure to exhaust available state remedies. Petitioner subsequently exhausted his available state remedies on November 21, 1996 when the Supreme Court of Kentucky denied his petition for rehearing.

Thus, the petition is not barred as a second or successive petition.

■ We further find that petitioner's application is not barred by the statute of limitations contained in the AEDPA. 28 U.S.C. § 2244 provides:

> (d)(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation shall run from the latest of—
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1). The district court, applying 28 U.S.C. § 2244(d)(1)(A), concluded that petitioner's time for direct review expired on March 21, 1983, the date on which the Supreme Court denied review of the Kentucky Supreme Court's opinion affirming petitioner's conviction. We disagree and hold that the applicable statute of limitations under the AEDPA is one year from the effective date of the AEDPA, to wit April 24, 1996.

Courts have employed several approaches in applying the statute of limitations provisions of the AEDPA. Some courts have accepted a literal reading of the statute and applied the one-year period of limitations to all cases filed after the date of enactment of the statute. *See United States v. Smith*, 966 F.Supp. 408, 409 (E.D.Va.1997) ("[T]he Court must measure one year from the most recent date provided by subsections (1) through (4) of Section 2255"); *Clarke v. United States*, 955 F.Supp. 593, 595 (E.D.Va.1997). The Second Circuit has held that the Act requires petitions to be filed within a "reasonable" time following the statute's enactment, which, in some cases, may be less than one year. *See Peterson v. Demskie*, 107 F.3d 92, 93 (2d Cir.1997) (holding that petition filed approximately one year after completion of state court direct review but within seventy-two days after the effective date of the AEDPA was filed within "reasonable time"). A third approach, embraced by the Third and Fifth Circuits, has emerged wherein the courts determined that a "one year" grace period from the effective date of the AEDPA is applicable. *See United States v. Flores*, 135 F.3d 1000, 1006 (5th Cir.1998); *Burns v. Morton*, 134 F.3d 109, 111–12 (3d Cir. 1998); *Calderon v. United States Dist. Ct.*, 128 F.3d 1283, 1287 (9th Cir.1997), *cert. denied* —— U.S. ——, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998); *Duarte v. Hershberger*, 947 F.Supp. 146, 148–49 (D.N.J.1996); *Martin v. Jones*, 969 F.Supp. 1058, 1061 (M.D.Tenn.1997).

In *Ellis v. United States*, we determined in the context of a § 2255 motion, "the reasonable time within which [petitioner] should be required to file his motion would be within one year of the enactment of the AEDPA." *Ellis v. United States*, No. 97–2077, 1998 WL 777995, *1 (6th Cir. Oct.21, 1998). In addition, we recently determined that a habeas petition filed on July 30, 1997, after petitioner's conviction be-

came final on March 2, 1993, was time-barred. *See Trice v. Toombs*, No. 98–1099, 1998 WL 808366, *2 (6th Cir. Nov.9, 1998). Thus, we join with the Third and Fifth Circuits, and hold that a one-year grace period from the effective date of the AEDPA is applicable.

Applying the one-year rule, petitioner had one year from the effective date of the AEDPA, April 24, 1996, to file his § 2254 petition. Petitioner filed the instant petition on February 12, 1997. Thus, we conclude that petitioner's application was timely filed within the provisions of the AEDPA. We, therefore, reverse the decision of the district court in so far as it dismissed the petition on procedural grounds.

Having concluded that the petition is not a second or successive petition, and that such petition was timely filed, we will turn to a consideration of the merits of the petition. The magistrate judge determined, if the petition were not barred on procedural grounds, petitioner would be entitled to relief on two of his habeas claims. In the Report and Recommendation, the magistrate judge concluded that the admission of Dr. Shaler's testimony resulted in the denial of fundamental fairness to petitioner and the trial court's denial of a continuance deprived him of a fair trial.

█ Under the provisions of the AEDPA, the district court must apply the following standard to the merits of petitioner's claim:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Recently, we had occasion to settle on the following interpretation of this standard. In *Nevers v. Killinger*, 169 F.3d 352 (6th Cir.1999), we noted:

[D]eference to the state courts' judgment required by the AEDPA is achieved by adopting the rule that the unreasonableness of a state court's application of clearly established Supreme Court precedent will not be "debatable among reasonable jurists," . . ., if it is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes. . . ."

*Id.* at 362 (internal citations omitted). Therefore, in the Sixth Circuit, "the writ will issue if the unreasonableness of the state court's application of clearly established precedent is not debatable among reasonable jurists." *Tucker v. Prelesnik*, 181 F.3d 747, 752 (6th Cir.1999). Under *Nevers, supra,* the application will not be debatable "if it is so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *Nevers,* 169 F.3d at 362 (citation omitted).

### Dr. Shaler's Testimony

█ The testimony at trial revealed that petitioner's brother, Mark Brown, believed that the victim, Bryant Dudley, had broken into Mark's home and stolen drugs from him. Mark Brown and petitioner took the victim for a ride on May 17, 1976. The following day petitioner and his brother were seen with the victim. On May 19, 1976, the petitioner traded his boots to a friend. Those boots were stained with Type A blood, the blood type of petitioner and the victim. A short time later, the police found the victim's body and deter-

mined that his death resulted from shotgun wounds.

The Commonwealth introduced evidence during trial linking petitioner to the death of the victim.[1] The evidence included the expert testimony of Dr. Robert Shaler, which the Kentucky Supreme Court summarized as follows:

> [T]he blood found on Appellant's [petitioner's] boots was found in only 4.6% of the population and could not have been the blood of Appellant [petitioner]. Dr. Shaler did not testify that the blood on the boots belonged to the victim and he did not rule out the possibility that the blood stain could have been the blood of a third person.

932 S.W.2d at 361. Following petitioner's conviction, counsel for petitioner obtained an affidavit from Dr. Shaler in which he conceded:

> [A]ddditional posttrial scientific research concerning the detection of genetic markers in dried blood indicates that the dried blood found on [petitioner's] boots indeed could have come from either [petitioner] or Dudley, and that he was mistaken when he testified that the blood could not possibly have come from [petitioner].

(Report and Recommendation at 25) (quoting *Brown v. Commonwealth*, No. 93–CA–1861–MR, p. 5 (Ct.App.1994)). The magistrate judge further notes:

> [C]ounsel's affidavit reflects that Shaler admitted that the application of GM testing to dried blood was novel and not commonly accepted in 1976, that his testimony that the test was reliable was mistaken, and that he would not have testified had he known about the problems with the anti-sera and the technique at the time.

(*Id.* at 25–26). Petitioner contends that the trial court improperly admitted the Shaler evidence where the GM testing of

dried blood did not enjoy general acceptance in the scientific community at the time of trial. (*Id.* at 23).

■ ` Habeas petitioners are not entitled to relief unless an error "had substantial and injurious .effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). A petitioner will prevail where "a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law" substantially affected a jury's verdict. *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). However, we will grant federal habeas corpus relief only where a violation of a state's evidentiary rule results in the denial of fundamental fairness, and therefore, a violation of due process. *Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir.1988). "The standard in determining whether the admission of prejudicial evidence constitutes a denial of fundamental fairness is whether the evidence is 'material in the sense of a crucial, critical highly significant factor.'" *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir.1989) (quoting *Redman v. Dugger*, 866 F.2d 387, 390 (11th Cir.1989)). Even assuming the state court erred in permitting Dr. Shaler's testimony, this court will grant federal habeas relief only where the error rises to the level of a denial of fundamental fairness. *See Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir.1993).

When reviewing the Kentucky Supreme Court's decision, the magistrate judge acknowledged that the issue of whether the admission of Dr. Shaler's testimony resulted in unfairness to petitioner was "admittedly a close issue." (Report and Recommendation at 30). At the time of the magistrate judge's decision, he did not have the benefit of the Sixth Circuit's in-

1. A detailed description of the evidence in this case is set forth in the two decisions from the Kentucky Supreme Court—*Brown v. Com-*

*monwealth,* 639 S.W.2d 758 (1982) and *Brown v. Commonwealth,* 932 S.W.2d 359 (1996).

terpretation of the AEDPA's standard governing review of habeas claims. Applying this standard, we cannot conclude that the Kentucky Supreme Court's decision that petitioner was not denied a fundamentally fair trial was "so arbitrary" as to be outside the range of "plausible outcomes."

The Supreme Court of Kentucky twice confronted the issue of the admissibility of Dr. Shaler's testimony. On direct review in 1982, the Kentucky Supreme Court found, "the only valid argument to be made against the Shaler evidence is addressable to its credibility rather than its admissibility." 639 S.W.2d at 760.[2] In discussing the evidence, the court noted that the evidence, without Dr. Shaler's testimony, "was sufficient to justify the conviction of Jim Brown...." *Id.* In its 1996 decision affirming the Kentucky Court of Appeals' denial of petitioner's 60.02(f) motion, the Kentucky Supreme Court rejected appellant's contention that the admission of Dr. Shaler's testimony warranted any relief.

> A review of the evidence at Appellant's trial fails to convince us that the outcome would have been different if all of Dr. Shaler's testimony had been excluded or if it had been admitted and Shaler's later misgivings had been available to the jury at the time of trial.

> As the summary of the evidence shows, there was ample circumstantial evidence in the record upon which the jury could have based its verdict. Indeed, as noted above, this Court has earlier concluded that the evidence at trial, absent the testimony of Shaler, was sufficient to convict Appellant Brown.

*Brown*, 932 S.W.2d at 362.

In so concluding, the Kentucky Supreme Court noted: "Dr. Shaler was subjected to

intrepid and effective cross-examination by defense counsel." *Id.* During cross-examination, counsel for defense elicited from Dr. Shaler that "his particular blood analysis was novel," "that it had been accepted as expert evidence in only one other homicide case in the United States (and that case involved Dr. Shaler himself as the expert witness)," "that he did not know whether the blood found on Appellant's boots belonged to the victim," "that the blood could have belonged to a third party," and "he had conducted testing with respect to only three blood antigens, when there are as many as 23 separate blood antigens that can be analyzed." *Id.* In light of these "admissions" on the part of Dr. Shaler, we cannot conclude that the admission of Dr. Shaler's testimony was so fundamentally unfair as to amount to a denial of due process. While admittedly Dr. Shaler's testimony was damaging to petitioner, we are not satisfied that it rises to the level of a "crucial, critical" factor in the jury's decision to convict petitioner. *See Leverett, supra.*

The jury, having heard Dr. Shaler's testimony and defense counsel's subsequent cross-examination, was free to accord it the proper weight. Further, we cannot ignore that the jury ultimately viewed Dr. Shaler's testimony in the context of the totality of the evidence adduced during the trial. Given these considerations, we do not conclude that the Kentucky Supreme Court's decision that petitioner was not denied a fair trial was so "arbitrary" that it was outside the realm of "plausible outcomes." Accordingly, we deny the petition on this issue.

### Trial Court's Denial of a Continuance

■ Petitioner next argues that the trial court's denial of a continuance deprived

---

**2.** In considering the admissibility of Dr. Shaler's testimony, the Kentucky Supreme Court in its 1982 decision stated:

> It [Dr. Shaler's testimony] is not to be likened to the lie-detector test, the result of which depend heavily on the skill of the

operator, and in which factors other than truthfulness are known to affect the result. Dr. Shaler's testimony was admissible on the same basis as any other expert opinion. *Brown*, 639 S.W.2d at 760.

him a fair trial. The Commonwealth called Dr. Shaler as its last witness on the second day of trial. Petitioner moved for a continuance so as to afford him the opportunity to examine Dr. Shaler's report and ascertain the validity of Dr. Shaler's conclusions. The trial court denied petitioner's motion concluding that the Commonwealth and defense counsel were equally unfamiliar with Dr. Shaler's testimony. The trial court's decision forced defense counsel to conduct his cross-examination of Dr. Shaler only a few hours after receiving Dr. Shaler's report.

█ With respect to the trial court's decision to deny a continuance, we cannot say that petitioner is entitled to an issuance of the writ. " 'When a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process.' " *Bennett v. Scroggy,* 793 F.2d 772, 774 (6th Cir.1986) (quoting *Hicks v. Wainwright,* 633 F.2d 1146, 1148 (5th Cir.1981)). Further, petitioner's claim that the denial of a continuance violates his due process rights must be dismissed unless the state court's determination of his claim was, "so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *See Nevers, supra.*

The state court's adjudication of such claim is found in its analysis of petitioner's direct appeal in which it noted that it was "somewhat disturbed by the trial court's refusal to grant a continuance...." *Brown,* 639 S.W.2d at 761. However, the Kentucky Supreme Court noted that defense counsel spoke with Dr. Shaler on Saturday before the trial commenced on Monday and at that time Dr. Shaler "indicated a hesitancy to testify, stating that his tests were inconclusive." *Id.* Although defense counsel was aware that Dr. Shaler might testify, counsel made no motion for a continuance until Dr. Shaler was called by the Commonwealth as its last witness.

The court further noted that "when presented with the opportunity during cross-examination, defense counsel failed to question Shaler about the doubts expressed in the Saturday conversation." *Id.*

We conclude that the state court's decision on this claim was not "so arbitrary" as to be implausible, and we further conclude that the failure to grant the continuance was not so prejudicial to petitioner's case as to warrant habeas relief. Defense counsel consulted with Dr. Shaler during the weekend preceding the trial and learned of Dr. Shaler's hesitancy over the results of his tests. The fact that defense counsel failed to bring this fact to the jury's attention does not merit the conclusion that the trial court's decision to deny a continuance was in error. Accordingly, we conclude that petitioner is not entitled to habeas relief on the basis of the trial court's decision to deny a continuance.

### Conclusion

For all of the foregoing reasons, we **REVERSE** the decision of the district court insofar as it concluded that the petition was procedurally barred. However, for the reasons stated herein, we **AFFIRM** the decision of the district court dismissing the petition for writ of habeas corpus.

MERRITT, Circuit Judge, concurring.

In response to this concurring opinion on the "fugitive disentitlement doctrine," Judge Moore makes the remarkable statement that Brown's fugitive status for ten years does not have "a connection to the appellate process in this court" (4th paragraph from end of concurring opinion). Her entire argument is based on this view of the facts. But my colleague seems deliberately indifferent to the overriding fact that Brown would have been in jail for murder and unable to escape but for our issuance of a writ of habeas corpus in 1980. Brown's escape is the direct result of this Court's action in 1980. But for our deci-

sion, Brown would have been serving his sentence for murder when he thereafter took flight. We are directly responsible for his flight. How can it be said with a straight face in this case that Brown's flight lacks a requisite "connection with the appellate process?"

The fugitive disentitlement doctrine limits access to courts in the United States by a fugitive who has fled a criminal conviction in a court in this country. The doctrine is long-established in both the federal and state courts, trial and appellate. The power of an American court to disentitle a fugitive from access to its power and authority is not jurisdictional in nature, *see Molinaro v. New Jersey*, 396 U.S. 365, 366, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970). ("[S]uch [fugitive status] does not strip the case of its character as an adjudicable case or controversy . . . ."), nor does it implicate constitutional privileges, *see Ortega–Rodriguez v. United States*, 507 U.S. 234, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993). Rather, the doctrine is an equitable one, *see United States v. Sharpe*, 470 U.S. 675, 681 n. 2, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), that rests upon the supervisory power of the federal courts to administer the federal court system, *see Goeke v. Branch*, 514 U.S. 115, 115 S.Ct. 1275, 131 L.Ed.2d 152 (1995); *Thomas v. Arn*, 474 U.S. 140, 146, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

The fugitive disentitlement doctrine was first applied in the federal courts in *Smith v. United States*, 94 U.S. 97, 24 L.Ed. 32 (1876). Drawing upon earlier state cases, the Court in *Smith* removed from its docket a criminal defendant's appeal from his conviction in the Washington Territory because the defendant fled the Court's jurisdiction prior to resolution and thus was not under the control of the Court.

In *Allen v. Georgia*, 166 U.S. 138, 17 S.Ct. 525, 41 L.Ed. 949 (1897), the Supreme Court of Georgia had dismissed an appeal to it by a fugitive from a death penalty conviction. Over due process objections, the U.S. Supreme Court upheld not only the state court's dismissal of the fugitive's appeal, but also its refusal to reinstate the appeal *after* the defendant's recapture, when enforceability was no longer at issue. In preserving the dignity of the judicial process, the Court stated:

> We cannot say that the dismissal of a writ of error is not justified by the abandonment of his case by the plaintiff in the writ. By escaping from legal custody, he has, by the laws of most, if not all, of the states, committed a distinct criminal offense; and it seems but a light punishment for such offense to hold that he has thereby abandoned his right to prosecute a writ or error, sued out to review his conviction; otherwise he is put in a position of saying to the court: "Sustain my writ, and I will surrender myself, and take my chances upon a second trial; deny me a new trial, and I will leave the state, or forever remain in hiding." We consider this as practically a declaration of the terms upon which he is willing to surrender, and a contempt of its authority, to which no court is bound to submit. It is much more becoming to its dignity that the court should prescribe the conditions upon which an escaped convict should be permitted to appear and prosecute his writ than that the latter should dictate the terms upon which he will consent to surrender himself to its custody.

*Id.* at 141, 17 S.Ct. 525. In *Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970), the Court refused to adjudicate the appeal of a convicted abortionist who refused to surrender himself to authorities after he was released on bail. The Court stated:

> No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction. While such an escape does not strip the case of its character as adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of

the Court for determination of his claims.

*Id.* at 366, 90 S.Ct. 498. In so holding, the Supreme Court in *Allen* and *Molinaro* simultaneously affirmed the principles enumerated in *Smith* and *Bonahan* and expanded the role of disentitlement as a penalty for flouting the judicial system.

In 1975 the Court in *Estelle v. Dorrough*, 420 U.S. 534, 95 S.Ct. 1173, 43 L.Ed.2d 377 (1975), confirmed the history and vitality of the doctrine and voiced still additional justifications for the fugitive disentitlement doctrine: promoting the dignified operation of the appellate courts and deterring felony escape. In response to an equal protection claim, the Court upheld a Texas statute mandating dismissal of an appeal where the defendant has escaped while the appeal is pending. In so doing, the Court stated that the statute furthered its intended goals of discouraging escape and encouraging voluntary surrender to authorities. See *id.* at 540, 95 S.Ct. 1173. Furthermore, the statute promoted "the efficient, dignified operation of the Texas Court of Criminal Appeals." *Id.* at 557, 95 S.Ct. 1173.

Finally, there can be little doubt that the delay occasioned by the period of a defendant's flight from justice can significantly prejudice the prosecution should a new trial be ordered after a successful appeal. In cases where such delay is significant— or, as in the instant matter, so long that it would appear to make reprosecution very difficult, if not impossible—"[i]t would be unconscionable to allow such a defendant to benefit from the delay by forcing the government to reprosecute him long after memories have dimmed and evidence has been lost." *United States v. Persico*, 853 F.2d 134, 137 (2d Cir.1988). We recently applied this same principle in *United States v. Lanier*, 123 F.3d 945 (6th Cir. 1997), even though the defendant remained a fugitive for only a few months and the evidence from the original trial had not grown stale.

As in the *Lanier* case, Petitioner Brown's conduct in the instant matter exemplifies the utmost disrespect for the judicial process. Brown first invoked the power and authority of the federal courts in 1977, following his murder conviction, when he filed a petition for writ of habeas corpus on the grounds that his direct state appeal was improperly dismissed. This Court affirmed the judgment of the U.S. District Court for the Eastern District of Kentucky that if Brown's state appeal were not reinstated, his conviction would be set aside. Brown's appeal was therefore heard by the Kentucky Supreme Court, which affirmed his conviction and remanded the case to the state trial court for resentencing. When Petitioner realized that the wheels of justice were no longer turning in his favor, he left for Australia where he eluded capture for a decade. Brown thus obtained a second chance to challenge his conviction and sentence by means of filings in both the state and federal courts. In so doing, he impermissibly delayed the appellate process for 10 years.

In *Ortega–Rodriguez v. United States*, 507 U.S. 234, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993), the Supreme Court held that where a defendant's flight and recapture occur before appeal, the defendant's former fugitive status does not *necessarily* have the required connection to the appellate process to justify an appellate sanction of dismissal. Precisely, the Court stated that it would not allow

> an appellate court to sanction by dismissal any conduct that exhibited disrespect for any aspect of the judicial system, even where such conduct has no connection to the appellate proceedings. Such a rule would sweep far too broadly, permitting, for instance, this Court to dismiss a petition solely because the petitioner absconded for a day during district court proceedings, or even because the petitioner once violated a condition of parole or probation.

*Id.* at 246, 113 S.Ct. 1199.

In the instant matter, however, Petitioner's conduct was far more egregious than

the minor infraction contemplated by the Court as not warranting dismissal. Indeed, it boggles the mind to think that Brown would be allowed to flee the judicial process for *ten years* and then return home upon extradition to challenge that process' alleged shortcomings as though he had availed himself fully of his avenues of legal recourse from the start. In June 1993, following his ten-year absence as a fugitive, Petitioner filed a motion in state court to vacate the seventeen-year old judgment against him. The state trial court's decision to deny that motion was affirmed by the Supreme Court of Kentucky. In July 1994, Petitioner filed a second, though not successive, petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Again, he availed himself of the mechanisms of the federal judiciary. That petition was dismissed without prejudice pending the exhaustion of all state court proceedings with respect to Brown's appeal from the denial of this motion to vacate his sentence. When the Supreme Court of Kentucky denied his petition for rehearing, thereby exhausting his state remedies, Petitioner yet a third time turned to the federal courts to petition for writ of habeas corpus, which petition was denied, leading to this appeal.

Petitioner Brown's behavior in the instant matter must be deterred. As in the *Lanier* case, he does not deserve a further decision on the merits. Following his conviction for murder, Brown invoked the mechanisms of the federal judiciary in order to guarantee the procedural integrity of his state court proceedings. His pleas by no means fell upon deaf ears. Fair cooperation can be maintained only as long as citizens respect their duty to conduct themselves according to the widely-accepted norm of equity and reciprocity. The individual may only demand reciprocity from the State—in this case the judiciary—when he himself has respected his basic duty as a citizen not to become a fugitive from justice.

MOORE, Circuit Judge, concurring.

I write separately to discuss whether this court should apply *sua sponte* the fugitive disentitlement doctrine.

Brown became a fugitive after a state court ordered that he be resentenced but before the resentencing occurred. Upon his recapture, Brown initiated state post-conviction proceedings based in part on new information undermining the scientific testimony that was significant evidence at his trial. The Mason Circuit Court and the Kentucky Court of Appeals considered and rejected the merits of the claims he now presses in federal court. The Supreme Court of Kentucky accepted discretionary review and affirmed on the merits. *See Brown v. Commonwealth*, 932 S.W.2d 359 (Ky.1996). Although Brown's escape occurred during the pendency of state proceedings, the Kentucky courts, for whatever reason, did not invoke the fugitive disentitlement doctrine. *Cf. Harris v. Commonwealth*, 311 Ky. 429, 224 S.W.2d 427 (1949) (dismissing an appeal of a fugitive who was still at large). In light of the Supreme Court's recent warnings against using our inherent power to control our docket as a tool for inflicting ad hoc punishment for the crime of escape, I do not believe it is appropriate for us, on the basis of his former status as a fugitive, to deny Brown his appeal of the district court's denial of habeas relief.

In the Supreme Court's early cases approving the fugitive disentitlement doctrine, appellants had effectively abandoned their appeals by fleeing the jurisdiction of the court. *See Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970); *Allen v. Georgia*, 166 U.S. 138, 17 S.Ct. 525, 41 L.Ed. 949 (1897); *Smith v. United States*, 94 U.S. 97, 24 L.Ed. 32 (1876). Dismissal pursuant to the court's inherent powers was warranted by the fugitive's abandonment of the case and unwillingness to submit to the authority of the court. *See Allen*, 166 U.S. at 141, 17 S.Ct. 525; *Smith*, 94 U.S. at 98. Later, the Court considered a state statute that

provided for automatic dismissal of a fugitive's appeal. *See Estelle v. Dorrough*, 420 U.S. 534, 535, 95 S.Ct. 1173, 43 L.Ed.2d 377 (1975). The Court held that the Constitution did not prohibit invoking this statute even after the fugitive was recaptured. *See id.* at 537–42, 95 S.Ct. 1173. It is important to note, however, that permitting a state to follow such a strict rule of fugitive disentitlement is not the same as adopting the practice as a matter of policy for the federal courts. It is also important that the dismissal in *Dorrough* was based not on the inherent powers of the court but on a statute enacted by the legislature. *Cf. Degen v. United States*, 517 U.S. 820, 823–24, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996) (stating that "[p]rinciples of deference counsel restraint in resorting to inherent power"); *id.* at 828, 116 S.Ct. 1777 (distinguishing the Court's holding that inherent powers did not support disentitlement in the circumstances of that case from the possibility that "enforcement of a disentitlement rule under proper authority" might be permissible).

The courts of appeals have on occasion applied the disentitlement doctrine to appellants who were recaptured before the commencement of their appeals and even to plaintiffs in civil proceedings who were fugitives in related criminal cases. *See, e.g., Prevot v. Prevot*, 59 F.3d 556 (6th Cir.1995) (dismissing suit under the International Child Abduction Remedies Act because plaintiff was a fugitive); *United States v. Persico*, 853 F.2d 134 (2d Cir. 1988) (refusing to review trial errors after defendant escaped for seven years between conviction and sentencing); *Broadway v. City of Montgomery*, 530 F.2d 657 (5th Cir.1976) (dismissing suit under 42 U.S.C. § 1983 because plaintiff-appellant was a fugitive in related criminal proceeding). In these cases, the courts expanded on the basis for the fugitive disentitlement doctrine, asserting that any fugitive from justice was "not entitled to call on the resources of an appellate court for a determination of his case." *Broadway*, 530 F.2d at 659.

In two recent cases, the Supreme Court rejected such expansive applications of the disentitlement doctrine. The Court first considered the case of a criminal defendant who had escaped after being convicted but before being sentenced and was a fugitive for almost a year. *See Ortega–Rodriguez v. United States*, 507 U.S. 234, 237, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993). Upon recapture, he was indicted and convicted for contempt of court and failure to appear. In the appeal of the original conviction, the court of appeals granted the government's motion to dismiss on the grounds that the appellant was disentitled to appeal because of his escape during the pendency of the district court proceedings. *See id.* at 239, 113 S.Ct. 1199. The Supreme Court reviewed the justifications for the fugitive disentitlement doctrine and noted that they "assume some connection between a defendant's fugitive status and the appellate process, sufficient to make an appellate sanction a reasonable response." *Id.* at 244, 113 S.Ct. 1199. The Court stated that "[t]hese justifications are necessarily attenuated when applied to a case in which both flight and recapture occur while the case is pending before the district court, so that a defendant's fugitive status at no time coincides with his appeal." *Id.* The Court noted that the district courts are "quite capable" of protecting their own jurisdiction with more finely tuned sanctions than are available to the courts of appeals, *see id.* at 247, 113 S.Ct. 1199, and it rejected the argument that an appellate court may "sanction by dismissal any conduct that exhibit[s] disrespect for any aspect of the judicial system." *Ortega–Rodriguez*, 507 U.S. at 246, 113 S.Ct. 1199. The Court concluded:

> [W]hile dismissal of an appeal pending while the defendant is a fugitive may serve substantial interests, the same interests do not support a rule of dismissal for all appeals filed by former fugitives, returned to custody before invocation of the appellate system. Absent some con-

nection between a defendant's fugitive status and his appeal, as provided when a defendant is at large during "the ongoing appellate process," *Estelle [v. Dorrough],* 420 U.S., at 542, n. 11, 95 S.Ct., at 1178, n. 11, the justifications advanced for dismissal of fugitives' pending appeals generally will not apply.

*Id.* at 249, 113 S.Ct. 1199.

In *Degen v. United States,* 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996), a unanimous decision, the Supreme Court re-affirmed *Ortega–Rodriguez's* limitations on the inherent power to refuse to consider claims brought by a fugitive, this time in the context of a civil action related to the criminal prosecution. Degen was living in Switzerland and did not return to the United States to face criminal prosecution for drug-related crimes. He did, however, seek to defend his property against a related forfeiture proceeding initiated by the government. The lower courts held that he was not entitled to appear in the civil forfeiture proceeding until he submitted to the criminal prosecution. *See Degen,* 517 U.S. at 822, 116 S.Ct. 1777. Reversing, the Supreme Court emphasized the need for "restraint in resorting to inherent power" because of the "danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority." *Id.* at 823, 116 S.Ct. 1777. Despite the possible prejudice to the government's criminal case if the forfeiture proceeding were to go forward while Degen remained a fugitive, the Court believed that disentitlement was "too blunt an instrument" and would be "an arbitrary response" to the government's concerns. *Id.* at 828, 116 S.Ct. 1777. Therefore, the Court held that Degen should be permitted to defend his property from forfeiture, noting that the district court could take steps to protect the integrity of the criminal case while not affording Degen any "advantage" due to his "unwillingness to appear in person." *Id.* at 827, 116 S.Ct. 1777. The lesson of

*Ortega–Rodriguez* and *Degen* is that we should refrain from using our inherent powers to deter conduct already deterred by the statutes criminalizing flight or to augment the punishments for that crime set by state and federal legislatures. Inherent powers exist only to the extent that they are necessary "to protect [our] proceedings and judgments in the course of discharging [our] traditional responsibilities." *Degen,* 517 U.S. at 823, 116 S.Ct. 1777.

In a case decided between *Ortega–Rodriguez* and *Degen,* this court dismissed a civil case because the plaintiff was wanted in Texas for violating the terms of his probation. *See Prevot,* 59 F.3d at 558. The plaintiff sued pursuant to an international treaty, seeking to have his children, who were living with their mother in the United States, join him in France. Acknowledging the requirements of *Ortega–Rodriguez,* we concluded that there was sufficient connection between the civil appeal and the plaintiff's flight because the civil case was his attempt to have his children join him in flight. *See id.* at 566–67. If he had not been a fugitive, he would have had no cause of action at all because his probation required him to remain in the United States. In addition, the plaintiff's refusal to come to this country hindered discovery in the civil case. *See id.* at 560. We therefore concluded that he was not entitled to use the courts as an aid to his flight. There is room for disagreement about whether this was a correct application of *Ortega–Rodriguez.* *See Daccarett–Ghia v. Commissioner,* 70 F.3d 621, 628 (D.C.Cir.1995) (declining to follow *Prevot*). There is also language in the opinion that relies on arguments later rejected by the Supreme Court in *Degen,* so it is not clear whether *Prevot* would be decided the same way today. *Compare Prevot,* 59 F.3d at 567 (arguing that dismissing the custody case was the only means available to punish Prevot for his other crimes and for "flout[ing] the interests of the criminal courts") *with Degen,* 517 U.S. at 829, 116 S.Ct. 1777 ("There

would be a measure of rough justice in saying Degen must take the bitter with the sweet, and participate in the District Court either for all purposes or none. But the justice would be too rough."); *see also Ortega–Rodriguez*, 507 U.S. at 246, 249, 113 S.Ct. 1199 (rejecting "reasoning that would allow an appellate court to sanction by dismissal any conduct that exhibited disrespect for any aspect of the judicial system" and stating that "punishment by appellate dismissal introduces an element of arbitrariness and irrationality into sentencing for escape"). There was in *Prevot*, however, at least some direct connection between the fugitive's flight and the proceedings in this court.

Like the forfeiture proceeding in *Degen*, habeas is a civil action that is closely related to a criminal case. Under the approach of *Ortega–Rodriguez* and *Degen*, disentitlement is inappropriate unless Brown's flight had a connection to the appellate process in this court. In *Ortega–Rodriguez*, the Court indicated that a lengthy escape might justify dismissal of a fugitive's appeal, even after recapture, because of the prejudice to the government if a retrial were required. *See Ortega–Rodriguez*, 507 U.S. at 249, 113 S.Ct. 1199. I would hesitate, however, to invoke the disentitlement doctrine *sua sponte* purely on the basis of possible prejudice to the government. The government has never argued that Brown's prior escape deprives him of his statutory right to petition for habeas relief, and the Kentucky courts whose proceedings Brown had directly disrupted allowed him to present the merits of his claims. I do not believe it is the province of the federal courts to punish a habeas petitioner for crimes committed under the jurisdiction of the state courts.

Federal habeas courts have generally treated state-court invocations of the fugitive disentitlement doctrine as we would treat any other state-law grounds for affirming a criminal conviction. In *Irvin v. Dowd*, 359 U.S. 394, 79 S.Ct. 825, 3 L.Ed.2d 900 (1959), the habeas petitioner

had escaped for three weeks during the state proceedings. Under the state's disentitlement doctrine, this escape was sufficient to dismiss his direct appeal. The federal district court refused to entertain the habeas petition because it believed the state courts had affirmed the conviction on that basis. The Supreme Court, however, pointed out that the state court's opinion had discussed both the disentitlement issue and the merits of the appeal, and that the discussion of the merits constituted an alternative basis for affirming the conviction. *See id.* at 403, 79 S.Ct. 825. Because the petitioner had obtained a decision on the merits from the highest state court, habeas review was available. *See id.* at 406, 79 S.Ct. 825.

Other courts of appeals have followed *Irvin's* approach to fugitive disentitlement in the habeas context, treating escapes during the state proceedings like any other state-law issue. Thus, when a state court dismisses a fugitive's appeal pursuant to the state's disentitlement doctrine, the recaptured fugitive's claims are cognizable on habeas only if the petitioner satisfies the usual tests for "cause and prejudice" or "actual innocence." *See Schleeper v. Groose*, 36 F.3d 735, 737 (8th Cir.1994). Similarly, the fugitive disentitlement doctrine can provide adequate and independent grounds for the state court's affirmance of a conviction only where the doctrine is applied rationally and consistently with state law. *See Doctor v. Walters*, 96 F.3d 675, 683–86 (3d Cir.1996); *Branch v. Turner*, 37 F.3d 371, 375–76 (8th Cir.1994), *rev'd on other grounds, Goeke v. Branch*, 514 U.S. 115, 115 S.Ct. 1275, 131 L.Ed.2d 152 (1995).

While the escapes in some of these cases lasted only a few days, the petitioner in *Doctor* was a fugitive for more than five years—not as long as Brown but still a significant delay in the state proceedings. Yet, the federal habeas court saw no reason to invoke the fugitive disentitlement doctrine on its own once it had concluded that the state court's decision did not pres-

ent a procedural bar to habeas review. I believe it is appropriate that we act with the same restraint in this case. Like federal district courts, state courts are quite capable of defending their jurisdiction and protecting the government from prejudicial delays. The Kentucky courts saw fit to consider the merits of Brown's challenge to his conviction despite Brown's escape pending resentencing in state court. I therefore see no reason for us to invoke this procedural bar *sua sponte*, and I concur in the majority opinion resolving the merits of this appeal.